# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FORT MYERS DIVISION

**ERNEST FELTON**,
    Plaintiff,

v.                                                                                                            8:24-cv-1549-NPM

**COMMISSIONER OF SOCIAL SECURITY**,
    Defendant.

---

# ORDER

Plaintiff Ernest Felton seeks judicial review of a denial of Social Security disability benefits. The Commissioner of the Social Security Administration filed the transcript of the administrative proceedings (Doc. 16), Felton filed an opening brief (Doc. 23), and the Commissioner responded. (Doc. 25). As discussed in this order, the Commissioner's decision is affirmed. –

## I. Eligibility for Disability Benefits and the Administration's Decision

### A. Eligibility

The Social Security Act and related regulations define disability as the inability to do any substantial gainful activity by reason of one or more medically determinable physical or mental impairments that can be expected to result in death or that have lasted or can be expected to last for a continuous period of not less than twelve months.[1] Depending on its nature and severity, an impairment limits

---

[1] *See* 42 U.S.C. §§ 416(i), 423(d), 1382c(a)(3); 20 C.F.R. § 416.905.

exertional abilities like walking or lifting, nonexertional abilities like seeing or hearing, tolerances for workplace conditions like noise or fumes, or aptitudes necessary to do most jobs such as using judgment or dealing with people.[2] And when functional limitations preclude both a return to past work and doing any other work sufficiently available in the national economy (or an impairment meets or equals the severity criteria for a disabling impairment as defined in the regulatory "Listing of Impairments"), the person is disabled for purposes of the Act.[3]

### B.     Factual and procedural history

On February 16, 2021, Felton applied for supplemental security income while incarcerated at the Northwest Florida Reception Center (Tr. 228–249). He asserted an onset date of December 17, 2020,[4] alleging disability due to the following: HIV, bad legs and back, and schizoaffective disorder. (Tr. 230). As of the alleged onset date, Felton was 50 years old and had past relevant work as a flagger. (Tr. 36).

On behalf of the administration, a state agency[5] reviewed and denied Felton's

---

[2] *See* 20 C.F.R. §§ 416.913(a)(2)(i)(A)–(D) (discussing the various categories of work-related abilities), 416.922(b) (providing examples of abilities and aptitudes necessary to do most jobs), 416.945(b)–(d) (discussing physical, mental, and other abilities that may be affected by an impairment), 416.994(b)(1)(iv) (defining functional capacity to do basic work activities).

[3] *See* 20 C.F.R. § 416.911(a).

[4] While the initial application notes "maybe around 2016" (Tr. 230) as the date he became unable to work, both the ALJ's decision and Felton's brief reference the December 17, 2020 date as the alleged onset date.

[5] In Florida, a federally funded state agency develops evidence and makes the initial determination whether a claimant is disabled. *See* 42 U.S.C. § 421(a); 20 C.F.R. § 416.903(a).

application initially on October 28, 2021, and upon reconsideration on November 21, 2022. (Tr. 150–54; 162–64). At Felton's request, Administrative Law Judge (ALJ) John Dawkins held a hearing during which Felton was represented by an attorney. (Tr. 57–90). The ALJ issued a November 24, 2023 decision finding Felton not disabled, (Tr. 24–26), and the administration's Appeals Council denied Felton's request for review. (Tr. 3–9). Felton then brought the matter to this court, and the case is ripe for judicial review.

### C. The ALJ's decision

The ALJ must perform a five-step sequential evaluation to determine if a claimant is disabled. 20 C.F.R. § 416.920(a)(1). This five-step process determines:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether these impairments meet or equal an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) if not, whether, in light of his age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.

*Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933 (11th Cir. 2015) (internal quotation omitted); *see also* 20 C.F.R. § 416.920(a)(4).

The governing regulations provide that the Social Security Administration conducts this "administrative review process in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). Unlike judicial proceedings, Social Security Administration hearings "are inquisitorial rather than adversarial." *Washington v.*

*Comm'r of Soc. Sec.*, 906 F.3d 1353, 1364 (11th Cir. 2018) (quoting *Sims v. Apfel*, 530 U.S. 103, 111 (2000) (plurality opinion)). "Because Social Security hearings basically are inquisitorial in nature, '[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.'" *Id.* Indeed, "at the hearing stage, the commissioner does not have a representative that appears 'before the ALJ to oppose the claim for benefits.'" *Id.* (quoting *Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000)). "Thus, 'the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Id.* (quoting *Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015)).

Nonetheless, while the claimant is relieved of the burden of production during step five as to whether there are enough jobs someone like the claimant can perform, the claimant otherwise has the burdens of production and persuasion throughout the process. *See* 20 C.F.R. § 416.912 (providing that the claimant must prove disability); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) (noting the regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work"). In short, the "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." *Washington*, 906 F.3d at 1359 (quoting *Doughty v. Apfel*, 245 F.3d 1274, 1280 (11th Cir. 2001)).

At step one of the evaluation, the ALJ found Felton had not engaged in substantial gainful activity since February 16, 2021, the application date. (Tr. 29). At step two, the ALJ characterized Felton's severe impairments as: degenerative joint disease of the right ankle status-post open reduction internal fixation, degenerative joint disease of the knees, degenerative disc disease of the lumbar spine, osteoarthritis of the shoulders, obesity, schizophrenia, and major depressive disorder. (Tr. 29). At step three, the ALJ determined that Felton did not have an impairment or combination of impairments that met or medically equaled the severity of an agency-listed impairment. (Tr. 30).

> As a predicate to step four, the ALJ arrived at the following RFC:
>
> [H]e can only frequently use his upper extremities for reaching, grasping, and fine manipulation. He can frequently crawl, crouch, kneel, balance, and climb ramps and stairs but only occasionally stoop and climb ladders, ropes, and scaffolds. He can understand, remember, carry out, and exercise judgment for simple tasks in a work environment with few day-to-day changes, no work with the general public, and only frequent interactions with co-workers and supervisors. Interactions should not be required to be more than superficial or work-related. (Tr. 32).

Consequently, the ALJ found Felton was able to perform his past relevant work as a flagger. (Tr. 36). The ALJ also went on to find that Felton could perform other work that exists in significant numbers in the national economy. (Tr. 38). In support, a vocational expert testified (Tr. 79–82) that an individual of Felton's age, education, work experience, and RFC can perform the following representative occupations:

- *Marker,* DOT #209.587-034, light, SVP 2, with 124,000 jobs;

- *Mail Sorter,* DOT #222.687-022, light, SVP 2, with 97,000 jobs;

- *Routing Clerk*, DOT #222.587-038, light, SVP 2, with 34,000 jobs.[6]

Thus, for purposes of the Act, the ALJ concluded that Felton had not been disabled since February 16, 2021, the date the application was filed (Tr. 38).

## II. Analysis

Felton presents two issues on appeal:

1) Whether substantial evidence supported the ALJ's determination that the opinions of Nurse Eckert and Dr. Koziel were not fully persuasive; and,

2) Whether substantial evidence supported the ALJ's RFC determination.

### A. Standard of review

The court "may not decide the facts anew, make credibility determinations, or reweigh the evidence." *Buckwalter v. Acting Comm'r of Soc. Sec.*, 997 F.3d 1127, 1132 (11th Cir. 2021). While the court must account for evidence both favorable and unfavorable to a disability finding and view the evidence as a whole, *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), the court's review of the administration's decision is limited to determining whether "it is supported by substantial evidence

---

[6] The DOT numbers refer to the *Dictionary of Occupational Titles* and its detailed explanations concerning each occupation's requirements. These descriptions include exertion and skill levels. Exertion refers to the work—in a purely physical sense—that the job requires, and is divided into five categories: sedentary, light, medium, heavy, and very heavy. Skill refers to the time it takes—during or before a job, such as prior experience or education—to develop necessary abilities, and it is divided into three categories: unskilled, semiskilled, and skilled. The "SVP" (Specific Vocational Preparation) provides further subdivision of the three skill categories into nine levels: SVP 1 and 2 are unskilled; SVP 3 and 4 are semiskilled; and SVP 5 through 9 are skilled. The expert's job numbers were for the national economy.

and based on proper legal standards." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020) (quoting *Crawford*, 363 F.3d at 1158)).

"[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). The inquiry is "case-by-case," and "defers to the presiding ALJ, who has seen the hearing up close." *Id.* at 1157. In other words, a "presumption of validity attaches" to the ALJ's factual findings. *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987). And if supported by substantial evidence, the ALJ's findings of fact are conclusive. 42 U.S.C. § 405(g). This means the district court will affirm, even if the court would have reached a contrary result as finder of fact, and even if the court finds that the evidence "preponderates against" the agency's decision. *Noble v. Comm'r of Soc. Sec.*, 963 F.3d 1317, 1323 (11th Cir. 2020) (quoting *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991)).

For claims filed on or after March 27, 2017—such as this one—an ALJ must use the same set of factors to assess all medical opinions. *See* 20 C.F.R. § 416.920c. No longer is an ALJ to afford deferential weight to the opinions of any particular source, such as a treating physician. *Id.* As to each medical source, the ALJ must consider: (1) supportability; (2) consistency; (3) relationship with the claimant,

including the length, frequency, and purpose of the examining and any treatment relationship; (4) specialization; and (5) other factors, such as the source's familiarity with other evidence concerning the claim, that tend to support or contradict the medical opinion. 20 C.F.R. § 416.920c(c). Supportability and consistency are the two most important factors. 20 C.F.R. § 416.920c(b)(2). Supportability refers to "the objective medical evidence and supporting explanations presented by a medical source … to support his or her" opinion. 20 C.F.R. § 416.920c(c)(1). Consistency looks to whether "the evidence from other medical sources and nonmedical sources" are consistent with the medical opinion presented. 20 C.F.R. § 416.920c(c)(2). Thus, persuasiveness, rather than weight, is the object at hand when assessing a medical opinion. 20 C.F.R. §§ 416.920c, 416.927(c).

### B. Substantial evidence supports the ALJ's decision to discount Nurse Eckert's opinion.

Felton first saw Nurse Alyson Eckert, a mental health provider, in April 2021, shortly after his release from prison in late February 2021. (Tr. 129, 1622–1624). At that appointment, his judgment was fair, and his insight was "good-fair." (Tr. 1623). Eckert noted his history of auditory hallucinations when he was not taking medication, but he had no perceptual disorders at the appointment. (Tr. 1622–1623). He had fair speech, an intact thought process, and unremarkable thought content. (Tr. 1623). Overall, he reported his mood "has been fine." (Tr. 1623).

In June 2021, Felton had similar objective mental status findings, and he

"reported a significant decline in symptoms when he is [medication] compliant." (Tr. 1618). At that time, his mood was "fine," and he reported the severity of his symptoms was 0/10. (Tr. 1618–1619). September 2021 records from Eckert reflect similar objective findings. (Tr. 1629–1631). In January 2022, Felton reported "seeing and hearing things again." (Tr. 1800). Yet, he again "reported significant decline in symptoms when he is [medication] compliant." (Tr. 1800).

In the following months, mental status examinations recorded by Shericka Cunningham, a registered marriage and family therapy intern who was supervised by Eckert, reflected Felton's depressed mood but cooperative attitude, intact judgment, and good insight in five appointments from April 2022 to July 2022. (Tr. 1772–73, 1786–99). By September 2022, when he presented to Nurse Eckert, she again observed his fair-to-good insight, good judgment, intact thought process, unremarkable thought content, and appropriate affect. (Tr. 1754–57; *see also* Tr. 1740–44, 1750–53 (reflecting similar mental status findings at appointments with Cunningham)).

When Felton continued mental health treatment in 2023, the objective evidence told a similar story. In January he presented coherent and organized, despite a depressed mood and affect. (Tr. 1916). He had good insight and judgment with coherent speech and thoughts. (Tr. 1916). Similar objective mental-status findings were noted in February, March, and April 2023. (Tr. 1899–1902 (March),

1903–06 (March), 1911–14 (February), 1895–98 (April)).

In May 2023, Eckert completed an assessment form (Tr. 1954–1957) on Felton. Among other findings, she found marked limitations in his ability to remember locations and work-like procedures, to carry out simple instructions, to sustain an ordinary routine without special supervision, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. She also found marked limitations in his abilities to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in the work setting.

The ALJ properly found Eckert's opinion unpersuasive. When determining that Eckert's opinion was not supported, the ALJ considered that although Felton "does experience mental symptoms, with resulting limitations, the record does not support that he is markedly limited in his social functioning, and in fact he is able to manage interpersonal conflict reasonably well." (Tr. 36). Earlier in the decision, the ALJ noted Eckert's observations that Felton "struggles to manage his symptoms, in particular his hallucinations, and has requested multiple medications adjustments to reduce the frequency of that symptom." (Tr. 32, 1745, 1755–56, 1765–66, 1772, 1775–1777, 1783, 1800–1801). And the ALJ noted that the medications improved

his symptoms. (Tr. 32, 1745, 1755–56, 1765–66, 1772, 1775–1777, 1783, 1800–1801). While true that Eckert observed adverse mental findings like guarded behavior, slow thought process, and depressed mood, it is up to the ALJ to resolve the conflict between conflicting medical evidence. (Tr. 34–35), *see Richardson v. Perales*, 402 U.S. 389 at 399 (1971).

Further, in determining inconsistency with other evidence, the ALJ noted that Felton's records "also show that he has a reasonable understanding of his medical conditions and treatment and has followed-up as needed." (Tr. 36). While the ALJ's discussion in this specific paragraph may be brief, we are required to read the decision as a whole. *See Raper v. Comm'r of Soc. Sec.*, 89 F.4th 1261, 1275 (11th Cir. 2024). And in other areas of his decision, the ALJ notes inconsistency. (Tr. 35, 141, 144–47).

Finally, we note that the ALJ did find Felton's depression and schizophrenia to be severe impairments and incorporated these findings into a restrictive RFC. (Tr. 29, 32). The state-agency expert consultants' findings helped inform this RFC, and the consultants did consider Felton's depression and schizophrenia. (Tr. 35, 144–147). As we must construe the ALJ's decision as a whole, we determine that there was more than a scintilla of relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion that Eckert's opinions were not fully persuasive. *See Raper*, 89 F.4th at 1275; *Goode v. Comm'r of Soc.*

*Sec.*, 966 F.3d 1277, 1280 (11th Cir. 2020).

### C. Substantial evidence supports the ALJ's decision to discount Dr. Koziel's opinion.

Dr. Amanda Koziel, a primary care physician, had a few appointments with Felton from March 2021 until June 2023. (Tr. 1879–1885, 1958–70).[7] In June 2023, Dr. Koziel completed a "Physical Residual Functionary Capacity Assessment" of Felton. (Tr. 1971–1979). In the assessment, she noted that Felton could occasionally and frequently lift less than ten pounds, could stand and/or walk (with normal breaks) for a total of less than two hours in an eight-hour workday, and had limited push and pull capabilities in his lower extremities. She noted his past history of chronic back pain, chronic bilateral osteoarthritis of the knees, and that he requires a cane to ambulate.[8] Koziel also checked boxes indicating that Felton could never crawl or climb ladders, ropes, or scaffolds. She handwrote that he had limited abilities to climb ramps or stairs, to kneel, or to crouch. She also noted that he could occasionally stoop and balance. But she did not elaborate on this as required by the questionnaire. (Tr. 1974). At Felton's last appointment in May, before Koziel completed the June assessment, Koziel placed a durable medical equipment referral for a cane to address his difficulty walking. (Tr. 1960–1961).

---

[7] The record only contains assessments from October 2022 and May and June 2023, but Felton's patient summary provides a broader treatment history.

[8] This cane was prescribed in May 2023, just before Koziel completed this assessment (Tr. 1961).

The ALJ properly found Koziel's opinions not fully persuasive. When determining that Koziel's opinion was not fully supported by the evidence, the ALJ considered Koziel's opinion that Felton "is limited to a very reduced range of sedentary work, requiring a cane." (Tr. 36). But Koziel had only previously noted that Felton wore a knee brace. (Tr. 36). It was not until May 2023 that Koziel first prescribed a cane. (Tr. 1961). At this visit, Koziel analyzed the X-rays she had ordered in response to Felton's complaints of knee pain, and she noted no abnormalities except for a healed fracture. (Tr. 1738, 1959).

In referring the cane, Koziel noted only "difficulty walking, not elsewhere classified … needs cane to assist with ambulation." (Tr. 1961). But the Social Security regulations are clear:

> To find that a hand-held assistive device is medically required, there **must be medical documentation establishing the need** for a hand-held assistive device to aid in walking or standing**, *and* describing the circumstances for which it is needed** (i.e. whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.) Social Security Ruling (SSR) 96-9p, 1996 WL 374185, *7 (July 2, 1996).

And so is the case law. If the record contains information showing a claimant uses a cane, an ALJ should explicitly consider whether the claimant has a medical necessity for using such a device and affirmatively reject it, if appropriate, so the reviewing court can be sure whether he intended to recognize use of a cane. *Ortiz v. Saul*, 8:19-v-199-T-CPT, 2020 WL 1527856, *7 (M.D. Fla. March 31, 2020) (cleaned up).

Here, Koziel offered no such evidence that complied with SSR 96-9, and the ALJ affirmatively rejected Felton's need for a cane.[9] So, we determine that the ALJ properly found Felton did not need a cane.

Concerning consistency with other medical evidence, the ALJ noted the examination results from Dr. Charles Lebowitz, who conducted a disability examination with Felton in September 2021. (Tr. 33–34, 1633–1640). The ALJ also considered that Lebowitz found nearly full muscle strength in Felton's legs, that he had full range of motion in all joints except his lumbar spine, and that he had a slight limp in his left leg. (Tr. 33, 1636, 1638–1639). Lebowitz also noted that Felton needed a cane in his right hand for support and stability, but said nothing else regarding the circumstances of cane usage.[10] (Tr. 1640). And in the opinion, the ALJ considered Felton's tenderness and instability (Tr. 34), but he weighed this against the normal MRI and X-ray exams, and other medical evidence indicating Felton had nearly full strength and range of motion. (Tr. 34–35, 132–133, 143–145, 1636–1640, 1679–82, 1737–1738, 1959–1961). As noted earlier, the ALJ must resolve conflicting evidence. *See Richardson*, 402 U.S. at 399. And here, the ALJ did so in

---

[9] "[Koziel's] opinion is unpersuasive as it is not supported by her own records or consistent with the other evidence. For example, she opines that the claimant is limited to a very reduced range of sedentary work, requiring a cane, but the record does not show the claimant ever using a cane to ambulate at any appointment. There are notations, however, of his wearing his knee brace." (Tr. 36).

[10] As noted in Felton's brief, Lebowitz's handwriting is barely legible. (Tr. 1640).

a manner that provided more than a scintilla of support.

Koziel opined that Felton's schizophrenia limited his ability to speak and hear. But the ALJ noted that no other evidence in the record suggested that Felton had any limitation speaking or hearing. (Tr. 36). And this analysis squares with the state agency consultants, who also found no speaking or hearing problems. (Tr. 35, 133–134, 145–146). Thus, there was more than a scintilla of relevant evidence that a reasonable person would accept as adequate to support the ALJ's conclusion that Koziel's opinions were not fully persuasive.

### D.     Substantial evidence supports the RFC assessment.

Felton makes a general argument that substantial evidence does not support the RFC finding that he could perform light work. He asserts that since the ALJ failed to properly consider the opinions of Drs. Koziel and Lebowitz, and the entirety of the medical records from the Orthopedic Medical Group of Tampa Bay, that the entire RFC for light work is unsupported. Besides this brief portion noting which pieces of evidence the ALJ failed to consider, this section of Felton's brief contains little elaboration. Felton reargues that Koziel's opinion was improperly considered for the reasons described earlier in the brief. But it makes no mention of how the ALJ failed to consider Lebowitz's exam or the entirety of the medical records from the Orthopedic Medical Group. As we found that the ALJ had properly considered

the record above, we find that the RFC is, in fact, supported by substantial evidence.

## III. Conclusion

Upon consideration of the submissions of the parties and the administrative record, substantial evidence supports the ALJ's decision, and there was either no error or no harmful error in the ALJ's application of the correct legal standard. Accordingly, the decision of the Commissioner is **AFFIRMED** pursuant to sentence four of 42 U.S.C. § 405(g), and the clerk is directed to enter judgment in the Commissioner's favor, terminate all scheduled events, and close the case.

**ORDERED** on September 30, 2025

_____
NICHOLAS P. MIZELL
United States Magistrate Judge